## West Chester School District v. West Chester Area Education Assoc.

*Ross A. Unruh,* for petitioner.
*Alexander A. DiSanti,* for respondent.

WOOD, *J.,* March 26, 1981—The West Chester Area School District (district) has asked us to review an arbitration award made by one L. Reed Tripp, an arbitrator appointed by the American Arbitration Association to consider a grievance presented by the West Chester Area Education Association (WCAEA) on behalf of itself, a named individual, Ira Robbins, and others similarly situated.

The school district had entered into a series of agreements with the WCAEA as a result of the collective bargaining process, one such agreement covering the period from July 1, 1976 until July 1, 1979. That agreement consisted of a number of parts, with two articles being of particular relevance here. Article VI outlined a procedure for settling employee grievances, and in Section 6.01 stated that "the purpose of this procedure is to secure an equitable solution to any *disputes* or grievances which may arise out of the *interpretation* of the provisions of this Agreement." (Emphasis supplied.)

Article VI then went on to define a grievance as a claim by a professional employee that the district had violated, misinterpreted, or misapplied any of the terms of the agreement; it defined an "aggrieved person" as the person or persons making the complaint; and provided that any grievance not brought within 30 days will be considered as having been abandoned.

Article IX of the same document purports to establish a procedure whereby teachers taking graduate work may receive credit for that work which would eventually be incorporated into a promotion and a pay raise. The pertinent sections of Article IX are as follows:

"9.0 All professional employees within the bargaining unit will be entitled to the following benefits, and under the conditions set forth in the District's policy book and as outlined below:

9.03 *Credits*—The Board agrees to reimburse each professional employee who qualifies for 90% of the cost of all graduate courses taken within his assigned teaching field and 40% of the cost of graduate courses outside his assigned teaching

field while in the service of the school district, provided:

9.04 *Changes in Preparation Level*— Advancement on the salary schedule in effect at the time will be approved upon satisfactory completion of the necessary credits by September 1 or February 1 of the school year, provided the professional employee:

a. Informs the District in writing, prior to the preceding June 1, that he will attain the necessary credits by September 1 or February 1 of the next school year.

b. Informs the District in writing upon completion of the necessary credits; and

c. Provides the District with an official transcript from the graduate school attended."

In September of 1979, the school district and the WCAEA executed a memorandum of agreement which committed them to "meet and discuss" the question of track changes. Without quoting at length from it, the memorandum may be characterized as concerning itself with future contracts, rather than as governing grievances and questions of interpretation arising under prior contracts.

On June 20, 1979, the WCAEA's Grievance Chairman filed a grievance alleging that the school district had violated the agreement by denying track changes to employees who had complied with all the conditions set forth in Sections 9.03 and 9.04 of the basic contract. The grievance stated that it was filed on behalf of the WCAEA, Ira Robbins, "and other members affected," and asserted that the grievance occurred on June 5, 1979. The grievance was submitted to arbitration, and the arbitrator held hearings and submitted his decision on February 20, 1980. During the course of the pro-

ceedings, it developed that Ira Robbins had made his peace with the school district, and had been granted the relief which he sought. However, evidence was presented showing that other teachers had been denied graduate credit during the period 1977 to 1979, with the most recent being a denial to one Richard O'Donnell, on September 17, 1979. In his decision, the arbitrator found that the grievance was arbitrable, and adopted the interpretation of Article IX which the WCAEA had contended for. The arbitrator also found that the September 1979 memorandum did not affect or remove his right to determine the issues.

Arbitration of disputes arising out of the interpretation of the provisions of collective bargaining agreements is mandated by statute: 43 P.S. § 1101.903. Our inquiry as to arbitrability is limited to a determination of:

(1) Whether or not the parties entered into an agreement to arbitrate, and

(2) Whether or not the dispute falls within the aribtrations clause: Shippensburg Area Education Association v. Shippensburg Area School District, 42 Pa. Commonwealth Ct. 352, 400 A. 2d 1331 (1979); North Star School District v. Pennsylvania Labor Relations Board, 35 Pa. Commonwealth Ct. 429, 386 A. 2d 1059 (1978).

The question is whether or not the arbitrator's determination arises out of the "essence" of the Agreement: Leechburg Area School District v. Dale, Ravotta and the Leechburg Education Association, Pa. no. 173 March Term, 1979 (opinion dated February 4, 1981). The "essence test" is based upon the principle that the parties have bargained for the arbitrator's decision and as long as the subject matter of the dispute is encompassed

within the terms of the agreement, the validity of the arbitrator's interpretation is of no concern to the court: Id: see also, United States Steel Workers v. Enterprise Wheel and Car Corp., 363 U.S. 593 (1960).

A review of the decided cases quickly reveals that arbitration of labor disputes between school districts and school teacher's unions is favored by the Courts, and our Supreme Court has said that where "an abitrator has interpreted a collective bargaining agreement in favor of the arbitrability of the grievance before him, a reviewing Court should be slow to disagree": County of Allegheny v. Allegheny County Prison Employees Independent Union, 476 Pa. 27, 381 A. 2d 849 (1977).

With these principles in mind, we turn to review the specific issues raised in this case. The school district first contends that the matter was not arbitrable because the only named grievant, Ira Robbins, had had his grievance satisfied. The Arbitrator found otherwise and observed that the grievance before him was

". . . a continuing one, essentially recurring each time that a salary check is computed on the basis of denied credits. The grievance cannot therefore be found to be untimely, though any retroactive salary payments, if indicated, should be limited to thirty calendar days prior to the date formally grieved consistently with subsection 6.02 of the agreement. . . . Since neither the District nor the Association can easily identify all denials that have been made, the issue must be viewed as one of contract interpretation which, once resolved, can be applied. If the District cancelled other denials as they did for Ira Robbins, no issue would remain but failing that, it must be found that the grievance before us is arbitrable and properly raises the ques-

tion of the meaning and application of Section 9.04 of the agreement."

The notion that a deprivation of a financial right may constitute a continuing violation is established in Pennsylvania law: Pennsylvania Turnpike Commission v. Atlantic Richfield Company, 31 Pa. Commonwealth Ct. 212, 375 A. 2d 890 (1977). The school district asks us to look at the language of Section 6.02 of the basic agreement, which says that "failure to submit a written complaint within thirty calendar days from the date upon which the action or event giving rise to the complaint occurred shall constitute a bar to further action," and to declare that none of the grievances other than Ira Robbins' grievance were timely filed. Quite apart from the problem of Mr. O'Donnell's rejection of September 1979, we think that that argument misses the point. The question is not how we would interpret that language, but whether the arbitrator had a reasonable basis for interpreting the language as he did. As noted earlier, the purpose of the Article on arbitration—or, to be more precise, "Settlement of Disputes"—says that the purpose of Article VI is to secure "an equitable solution to any disputes . . . which may arise out of the interpretation" of the contract. We think that it is in keeping with the intent and purpose of the contract that the arbitrator treat this matter as a live dispute arising out of a difference in interpretation of a clause in the contract which affected not only the union but its members, and we cannot say that there is no rational basis for his conclusion that the dispute was arbitrable.

Having found the dispute arbitrable, we find little merit in the school district's challenge based on the interpretation of Article IX. There is no question but that the agreement provided for track

changes based upon graduate credits received. The arbitrator's decision is, in effect, that the teachers who were denied track change credit had in fact complied with all the requirements of Section 9.04, and were entitled to credit. The school district says that Section 9.0 of the agreement incorporates the school district's "policy book" so as to allow denials of track changes even when the stated criteria of Sections 9.03 and 9.04 have been met. However, if this interpretation were correct, the school district could amend Article IX at will, simply by amending its policy book. We think that what was intended by the reference to the policy book was that the school district would set forth in that document the mechanics by which the provisions of Article IX would be put into effect. We do not think that the policy book can override the criteria for track changes plainly set forth in Article IX. Not only do we consider that the arbitrator's interpretation had a rational basis, and that it arose out of the essence of the contract, we believe that his interpretation was correct based on the wording of the contract itself.

The school district also contends that the WCAEA had no right to abitration because it had agreed to "meet and discuss" the issues of track changes in the September 1979 memorandum. We would not wish to interpret that memorandum as affecting the rights of individual teachers which had already accrued prior to September 1979, but since we interpret the memorandum as operating only in regard to future contracts, we need not reach the issue of vested rights.

## ORDER

And now, March 26, 1981, after oral argument, and upon consideration of the record and briefs, we

dismiss West Chester Area School District's petition for review and affirm the award and opinion of the arbitrator.